Good morning, Your Honors. My name is Mark Page, and I'm representing Mr. Murphy Halwood, who was the defendant and is the appellant in this case. I'd like to start my remarks with discussing the mistrial issue, as I'll refer to it here. And the way I see that issue for this Court to decide is this. Does a district court's pretrial order mean anything? Does it matter? Does it have value? Does it have to be followed? Because in this case, on this issue, we had a pretrial order that said, do not bring in the evidence of a threat regarding a shotgun. And that evidence was brought in by the United States attorney, the assistant United States attorney, during the trial. There was objection. There was a second objection, and it was brought in anyway. The governments addressed this issue in their briefing. They addressed it. And then it was stricken from the record, right? Excuse me? And then it was stricken from the record? Correct. There was a – after a lunch recess, there was a curative instruction, and it was – the Court ordered it be stricken. Okay. There was argument by counsel prior to that, and the government made the argument there, attempted to make the argument there, that this is somehow related to cross-examination regarding that witness remembering things on that day or during testimony that he hadn't said before. The transcript clearly belies that explanation. That is not what happened. The transcript is clear. And a couple of points that I'd like to make on that issue. One has to do with the government has also taken the position in its brief that the curative instruction is adequate and solves the problem, and therefore a mistrial was not necessary. However, I would direct the Court, when it has the opportunity, to look at the government's excerpts of record at page 142, where the government made the exact opposite argument at the trial court at the time that we were discussing this in chambers after the misconduct, when they said, in the event that the Court feels that it ought to be excluded, I believe it cannot be stricken and excluded without further prejudice to the defendant or need for a mistrial. So they're arguing the exact opposite to you that they argued to the district court, in which they said, in essence, if you give a curative instruction, we're going to need a mistrial. A curative instruction was given. And our argument was we needed a mistrial then and we need it now. The second point, a second point I'd like to make on this briefly is, again, if the Court has opportunity later to consult the defendant's excerpts at pages 7 and 8. At the end of the bottom of page 7 and on to the top of page 8, that's a document which was the government's response to the defendant's motion in Limine regarding this precise issue, the evidence of the shotgun. And that portion of their brief, that paragraph of their response, I'm sorry, tells you what significance they believe that evidence would have to be admitted at trial. And, again, it belies the positions that they take in their brief. What they said there is that the reason this is necessary and the reason the jury should hear it is because this was the statement would not be offered for its truth, that the assailant's intended to use a shotgun, but rather to show the effect upon the listener and or an intention to intimidate potential witnesses. The ominous statement is also necessary to explain Leroy Draper's, that's the witness, response following the assault and his subsequent involvement in the case. And it goes on. And what it's saying is that that evidence will tell the jury that, essentially, these guys are bad guys and they tried to intimidate them. And that's exactly what happened. And that goes to the issue of why they did what they did in the first place. I guess there's no question, of course, that it was error to bring this out. And I guess one of the questions that probably entered the trial court's mind is that the threat is not made by the defendant. Does that, I mean, the threat that was supposed to be excluded got in, but it's a threat not by the defendant but by another. Well, Your Honor, I don't know if that was the trial court's thinking or not, to be honest with you, because it's not expounded on, but I would respond to that type of. If we're looking at prejudicial error, that's one thing we're going to look at, I suppose. Right. And that type of my response to that thought would be this, that the person that was claimed at trial to have made the threat, first of all, the witness claimed at various times that he didn't know any of these guys, whether he recognized their voices, who said what, and things like that. So, frankly, his claim in rehabilitation that it was made by this Darylton character is not necessarily credible based on the whole body of his testimony in which he's all over the map on everything. The second thing about that is that even if it was made by the other guy, the government's whole case was that all these fellas were acting together, that Darylton, the one who is alleged to have made this statement, was acting with my client and the others. They were all involved in the incident, and they all left together, and that the threat covered them all, essentially. So even if that distinction were so, it means nothing because of the entirety of the government's case, which lumped them all together anyway. I'd like to, and as far as prejudice to the defendant, I would go one step further as to say that in reality when the entirety of the record is looked at, you'll notice that Leroy Draper, the witness that was on the stand when this took place, was the government's key witness, okay? Because he's the only one that really saw anything. The victim himself knows virtually nothing about what happened. Other people were in their houses and came out after it was over. Leroy Draper is the key witness, and that's where this happened, and this is the one that they were supposedly threatening. I'd like to move on to a different issue, and that is that I've raised the issue of recording of statements or the refusal to do so by the FBI as a matter of policy. And I think this is an incredibly important issue, and I believe that the circumstances of this case demonstrate how the policy of the Department of Justice or the FBI not to record statements can be exacerbated. And in this case, as we pointed out in our excerpts of record, and again, when the Court has time, I think it's important to read through the defendant's excerpts of record or appellant's from 79 through about page 82. But in those pages, and particularly at page 82, the government takes full advantage of their refusal to record these statements by claiming that what is the glaring inconsistency between what he told them referring to the agents on those two prior interviews and what he told you while he was on the witness stand? Well, he forgot to mention self-defense. And then it goes on, chastising the defendant, telling the jury essentially that the defendant is just making this up now. And as we refer to in our brief, that's simply not accurate. We'll never know precisely what was said, why the agents refused to clarify or anything, because they chose not to as a matter of policy to record these statements. And as I've indicated both in my brief and in my reply, in today's age, in 2005, we can't be sitting on something in 1977 that says, well, it's not necessary. The Supreme Court, as I listed a number of different cases, has constantly used this idea of evolving standards and evolving standards in different areas. And here what we have to see is there is clearly an evolving standard of technology, an evolving standard of due process that says at this day and age, it's absolutely ridiculous to be refusing, refusing to record statements with a suspect. And it's a very difficult case to go through. And we're going to have to go through the Supreme Court, because it sounds to me like this is something, an evolving standard that the Supreme Court is going to have to... Well, I don't know if it will be. I'm generally... I understand your argument. I don't understand the policy either. We do have a case, though, that let them do it. That's correct. And the government has said in its brief that one panel can't overrule another. And I disagree with that, I guess, a little bit based on this circuit's own case. We can disagree with it. I mean, yes, one panel can, if there's been an intervening Supreme Court decision or an intervening in bank decision or something like that. But we'd have to go in bank, I think, to overturn that case. I understand that, and that is certainly another option subsequent to this for that type of motion. Whether it's going to go to the Supreme Court or not, I don't know. It would probably require someone else to do that, someone much smarter than me, but I suppose that's a possibility. On the flight instruction, the brief sets it forth. I do need to apologize. I noticed an error in my brief where I said that the Silverman case approved the flight instruction. That's inaccurate, the Silverman case. The district court approved it and gave it, and then the appellate court said, no, you shouldn't have. The flight instruction here, the bottom line on that to look at is that the theory of the government is that he fled, and it shows consciousness of guilt that he left the scene and went home and went to bed. Not straight home, no, that's correct. But there was about two hours where they kicked around, I think was the phrase they used, in a culvert. And I would have to say to the court on the reservation, you know, just hanging around is not uncommon. But beyond that. There was testimony that they did it because they were afraid the police would be around or something like that. Well, that's true. But they were also there to buy drugs. They were there. There was supposedly some threat about a shotgun. There was a number of other things. And also, that may be true as far as what Darrelton thought because of his conduct. That might be true what some of the others, Wilbert or others, thought because of their conduct. But that's not necessarily that the defendant thought I have committed a crime, I have no legal defense, and therefore I'm going to flee. Because if so, then you have to assume that the only thing he thought is that, well, the statute of limitations is two hours. So if I hang out in a culvert for two hours, I'm clear. And that's not what happened. He went home. And those cases say that it needs to be an unbroken chain that goes all the way through, not just stopping at the time. Counsel, are you suggesting that most people who flee have to continue in flight forever until they're picked up? Or else you can't get a flight instruction? I want you to know right now that in my experience, which is I've been around for a while, people who get picked up generally get picked up within the same county where they live. They don't go that far away. They're in flight, but they don't go that far away. That may be correct, Your Honor. However, this is an incident that is alleged to have occurred around midnight. By 530 or 6 in the morning, my client's arrested, sound asleep in his own bed in his own home. What do you want to make it? Two hours is not enough, but three hours is or five hours is? Isn't that a question of fact? Isn't that something that is better handled in a trial court? I don't know. Well, what I'm looking at is that the cases that talk about the flight instruction don't come anywhere near this. And if you look at this case, if the flight instruction is okay in this case, there would be no criminal case, virtually no criminal case in which a flight instruction wouldn't be good. Unless the defendant robs the bank and sits down on the curb and waits for the police to show up, it would be flight under these facts, under this scenario. And that's just not, I don't believe that's the case law. I don't believe that's the unbroken chain that has four parts to it. Well, okay. I suppose that could be argued to the jury, couldn't it, that he didn't flee? Well. He was just sitting around in a culvert. Well, it can be and it was. But the problem is the strength of the instruction that says that if you think that he fled, you can go ahead and infer that that means he knows he's guilty of exactly what he's charged with here. And that's the danger of it and why it should be used sparingly. Okay. Thank you. May it please the Court. I'm Assistant United States Attorney Sue Song representing the United States. I was trial counsel in this case. As a result of the assault by the defendant on Morrison Hardy, who was then 17 years old and about 100 pounds, he suffered a skull fracture, facial fractures, potentially fatal subdural hematoma, memory and concentration deficits. He got clobbered. We know that. On this record, Your Honors, this Court should affirm the verdict because this defendant received a fair trial and the evidence in support of conviction was overwhelming. The jury split verdict in this case. Acquitting this defendant of assault with a deadly weapon is strong evidence that the verdict wasn't prejudiced by any prosecutorial misconduct. In the context of the whole trial, the misconduct in this case was isolated and it was not inflammatory. One question, one response, stricken by the Court, and the jury was instructed to disregard it. In the absence of any evidence to the contrary, we can presume that the jury followed the instruction and didn't put credence on the statement that was stricken from the record, the statement elicited by Leroy Draper. The possibility that this improper question and response materially affected the verdict is extremely remote. Look at the substance of the statement itself. It was not attributed to the defendant. It was attributed to Dalton Yazzie, defense counsel, I believe said Darylton Yazzie, who was at time of trial an unindicted co-defendant. The defendant in this case was not charged with any firearms offenses. The statement related to a threat about a shotgun. The jury's verdict acquitting this defendant of assault with a deadly weapon shows us that there was no prejudicial association made between the stricken reference to a shotgun and any weapon that may have been alleged in this indictment. The trial court was in the best position to gauge the impact of the error in this case upon the fairness of the trial, and it rejected a motion for mistrial in favor of striking the statements and issuing a curative instruction. This was not abuse of discretion in the context of the whole trial, and in the absence of evidence to the contrary, we can presume that the jury followed that instruction. The independent evidence of guilt at this trial was compelling. This was not a close case. The co-defendant, Darylton Yazzie, testified about the assault by the defendant and three others upon this victim. There were eyewitnesses that put the defendant at the scene. There was voice recognition of the defendant by Daniel Draper. Leroy Draper was not central to this case. What he did help to explain, which was corroborated by the defendant's own testimony, was that these four men were angry because they went there to buy marijuana and they couldn't. And when the victim came outside, not in any involvement with that botched marijuana transaction, they preyed upon him and beat him up out of anger against Leroy Draper. Windows had broken, rocks had been thrown. The mood of that night was set through the eyewitnesses, and Leroy Draper merely corroborated what other witnesses testified to. The witness himself could not say who hit him, but what he did remember was that he saw the defendant and then he was blindsided and struck on the right side of the head. The defendant testified, yes, I hit this person on the right side of the head, self-defense notwithstanding. Dr. Nathan Avery was a trial witness, and he said that there was a skull fracture on the right side of the victim's head. The defendant, by his admission, struck the little guy, as he referred to him. He didn't call him by name, and knew that when he left that place, the little guy was on the ground severely injured. There were two post-arrest statements that were testified to by Agent Robel and by Investigator Charlie in this case. In both of those statements, the defendant admitted to hitting the victim in this case. Contrary to the defendant's assertion, the prosecutor's improper question was made in good faith and was not willful. It is not the government's position that the way that transcript reads, that it had to be known that that final question would elicit the shotgun statement. The prosecutor stayed in mind at the time that the question was answered was this. She had not scrutinized the minute entry that set forth the Court's order that required leave of court to ask that question. The prosecutor's good faith mistaken belief on the basis of the Court's ruling in Chambers, which unfortunately is untranscribed, was that she did not have to seek leave of the Court. It was her belief then that the defendant had made that statement relevant through no less than four or five questions suggesting that that witness could recall no specific statements from the night of the assault until he apparently made them up at trial. And that was simply not the case. The prosecutor is not excusing her misconduct in this case. The government is not saying that it was appropriate to ask those questions. There is an untranscribed court proceeding, and that's not offered as an excuse. It is simply by way of explanation that the misconduct was not deliberate and not willful, and there's nothing in the record to support that. The Court made no such finding. The prosecutor's statements, when you look at the record, show that she apparently was operating under the belief that it was appropriate to ask that question, given the defense counsel's questions on cross-exam. The Court in this case reviewed the record, heard argument, met with the court reporter, and decided that on balance a curative instruction and striking the response was appropriate. The defendant's argument that it was misconduct to elicit any responses in relation to threats generally is utterly without support on this record. At ER 93, the clerk's record indicates that the court granted the motion in limine with respect to the reference to the shotgun period. So to elicit from this witness concern about threats generally was not in violation of the court's order, and that simply is not supported by the record. The test in this case, however, is not whether the prosecutor willfully flouted the court's order. The government strongly urges this court to review the record and see that the prosecutor did not intentionally flout the court's order. The test is whether the verdict was effective. The test is whether this defendant had a fair trial, and whether this isolated and not inflammatory statement must have affected the outcome. And on balance, it simply cannot be. Again, I would urge the court to look at the split verdict in this case. This was a functioning jury. They weighed the evidence. They decided that the defendant was guilty of one charge and acquitted on the other. They were not inflamed. Their verdict does not suggest that they were out to punish the defendant due to one answer to one question that was asked on the second day of a trial that spanned four days. The defendant cannot rebut the presumption that the jurors acted appropriately and disregarded that statement. With respect to the flight instruction in this case, it was wholly appropriate. What the Dixon and Silverman cases emphasize is that the flight has to be immediate. And in this case, it's not contested that it was immediate. It was an immediate response to people coming out of the trailer to see what the commotion surrounding the assault was. According to Daryl Tenyazi, it was an immediate response to avoid police contact. He testified that he, who was with the defendant, knew that the police were looking at them. And to emphasize the facts again, the defendant and others fled from the scene. Three eyewitnesses have them running off, yelling, fled from the scene and didn't go home, didn't get into bed. They went and sat in what sounds to be a ditch under a bridge for several hours with full knowledge, according to the co-defendant, that the police were looking for them. In addition, the defendant in this case, by his own testimony, knew that when he left that scene, the victim was on the ground, severely injured. And what do you make of your opponent's argument that you must be able to give a flight instruction in virtually every criminal case because the perpetrator almost always leaves? I think that that's not what the cases say. And certainly this case was a very strong one in favor of flight. First of all, it was a very permissive instruction to the jury. The jury was permitted to draw an inference. And the court made clear that there could be reasons fully consistent with innocence that could cause a person to flee. And in the instruction, the court laid out what those could be, a fear of the police, that there are innocent reasons that a person would flee, but that the jury could consider evidence as consciousness of guilt. In this case, there was direct evidence of consciousness of guilt. This wasn't a case where the permissible inference would have existed without direct evidence from the defendant's own testimony and the co-defendant's testimony about what the defendant and the other assailants knew when they left that scene and hid out. What did the defendant say? The defendant said that he did not want to be there when the police came. He denied running, although that was clearly contradicted by all of the other witnesses. But he said he walked away from the scene. His timing was clearly contradicted by the other witnesses. He put it at about an hour. He was arrested at 6 a.m., and the police testimony was clearly that they were patrolling the area, looking for the defendant, went to his home, asked his mother if he was home, went to other relatives. It's clear that he was not in his home, in his bed, until sometime that morning. The defendant said that he knew, again, that the victim was on the ground and severely injured when he left and that he did not want to be there when the police came. So there was evidence in the form of the co-defendant and the defendant's own testimony about actual consciousness that something had happened, whether or not there was a self-defense justification offered by this defendant. On balance, given the immediacy of the flight, the Silverman case was a case where, as I read it, two weeks had elapsed before the defendant in that case didn't even flee but misrepresented identity. The Silverman case is clearly a very different animal. In Dixon, it was immediate flight, and I think that for that reason the instruction was given and was, as I said, very permissive, did not direct the jury to find anything. And, again, by their verdict, we can tell that they went through the evidence and convicted on one count and acquitted on the other. Can I just ask, are there any further questions on the case? Because I just wanted to ask a question. You tried the case? I did. Our sheet says that you were in Pittsburgh. Have you left the U.S. Attorney's office? I am with the U.S. Attorney's office in Pittsburgh. I made a move for personal reasons. I'm sorry. Were you with the U.S. Attorney's office in Arizona? Yes, I was. And you've now left and you're in Pittsburgh? Correct. Okay. I just didn't expect that. I know it's confusing. Okay. But, yes, I was trial counsel and at the time was an assistant U.S. attorney in Phoenix. Could you pass the message back to the U.S. Attorney's office in Phoenix, just from at least this member of the panel, that the next time that there is a ruling in chambers on something that involves the interpretation of a pretrial ruling of the court, that you get a ruling on the record? Absolutely. And I can assure this Court that this counsel will make sure it never happens again. Without any further questions, I would ask the Court. You don't have anything to say for the FBI's policy of never recording anything in this day and age? Your Honors, on this record, all we know is that it was the policy. There's no evidence of bad faith. And despite defense's efforts to get around clearly binding precedent, there was no destruction of evidence. The FBI agent testified that it was FBI policy not to record. The criminal investigator did not phrase it as a policy, but it was more of a custom and practice not to record statements. That's all the record reflects. Every police department in the country is televising its statements and everything else. We know everything that happened when an interrogation goes on and the FBI has a policy, they won't do any of that. You might pass that word along to us. Of course. Okay. Thank you. On balance, Your Honors, this was a fair conviction. The split verdict bears that out. The improper statements were stricken and the jury was instructed to disregard. The conviction should be affirmed. Thank you. Thank you, Your Honors. Just a couple of quick remarks. The suggestion that the evidence of the split verdict is evidence that the jury was independent thinking and did what the judge said I don't think carries the day. The two charges were assault with a dangerous weapon, not a deadly weapon, and that was alleged to be a pipe. The other charge was assault resulting in serious bodily injury, which is the count of conviction. The jury had to quit on the pipe because there was no evidence of it. Nobody saw anybody get hit with anything. There's no evidence of anybody being hit with anything. The police never looked for anything. No pipe was ever found. No evidence of it whatsoever, except that it may have been carried, someone was playing with it on the way they were walking over there and tossed someplace in the woods on their way. So, and here we're introducing a completely different element, a shotgun into this situation. The suggestion that, well, the court's order didn't preclude generalized threat discussion is silly because the only threat that was made was a threat to come back with a shotgun. And as the court pointed out, important to look at it that is the prosecutor knew exactly what answer was coming because the question was, how did he threaten you? He said he had some backup and stuff. And then a couple questions later, did he use the word backup or a different word? And that's when the answer comes. He used a different word. Question, what word did he use? He said, I have a shotgun for you. The prosecutor knew what was coming. She knew what the court order was. We've had, I guess, some testimony, if you will, today as to what she was thinking at the time. The evidence doesn't support it. The claim that that was because I asked questions about what this guy was testifying to and never having talked about specific words before. Again, if you look at the transcript, that isn't what happened. And second, there were only two statements that he testified to that he hadn't talked about before, and I limited my cross-examination to those two statements. And those can be found on page 113 of the government's excerpts, and that was when the guy suddenly testified at trial that he knew there was a fight going on because he heard people saying, come on, come on. He'd never said that to anybody before. And the other one is earlier at the government's excerpts on page 82 and following, and also a little bit earlier than that at page, looks like 27A and following, with respect to a statement that the government brought in about him saying, the effing little guy who was talking S. And what that statement's about is showing that the incident that occurred with the victim, who got beat up in the fight, had nothing to do with the purchase of drugs. They were completely separate incidents relating to other matters where some of these guys went to school together. The presumption that because the jury split their verdict means they didn't want to punish this defendant, again, as I mentioned before, just doesn't fit because we're talking about a completely different weapon, we're talking about a completely different use for that weapon and purpose for that weapon, and it's just as easy to say that the jury went back and said, well, we can't convict him because of the pipe because there's no evidence of it, but we can't let him go because he's a danger to the community, there's shotguns out there, we're talking about shooting people, so we've got to convict him of something. So we result in the ---- You know, they don't ñ they're probably more worried about this badly injured guy lying on the ground in the arm like a threat to a shotgun that was never in evidence. Well, they might be, Your Honor. We don't know, and that's the nature of the prejudice, Your Honor, is we don't know that because my client did have a viable and legitimate self-defense that he argued, and this ties into the whole reporting issue as we end up back there again, that the government made no effort to preserve that evidence. They stand here and claim that he never said that before. They make it sound like this case was very simple. It was not. Leroy Draper, a lot of problems. The victim himself said that he saw my client 30 or 40 feet away over by his dog when suddenly he got hit. Well, that puts my guy 30 or 40 feet away, and then he doesn't remember anything after that. I'm sorry. I don't think we need to hear the whole jury argument again. Okay. Thank you very much. But there's a number of different issues. I ask that you vacate the conviction and remand it and let us sort it out down there as far as whether there's jeopardy or not. Thank you. Thank you. The case just argued is submitted for decision. We'll hear the next case, Jason Dale, Jack v. McGrath.
judges: Schroeder, Canby, Duffy